**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 21, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

SOUTHWEST STAINLESS, LP, a
Delaware limited partnership; and HD
SUPPLY, INC., a Delaware
corporation,

       Plaintiffs-Appellees,

v.

JOHN R. SAPPINGTON; WILLIAM
B. EMMER; ROLLED ALLOYS,
INC., a Michigan corporation; and
RONALD L. SIEGENTHALER,

       Defendants-Appellants.

No. 08-5127

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:07-CV-00334-CVE-FHM)**

Justin D. Flamm (Timothy P. Reilly, J. Ronald Petrikin and Jason S. Taylor,
Conner & Winters, LLP, Tulsa, Oklahoma, with him on the briefs), Taft Stettinius
& Hollister LLP, Cincinnati, Ohio, for Defendants-Appellants.

Dinita L. James (William E. Grob, with her on the briefs), Ford & Harrison, LLP,
Phoenix, Arizona, for Plaintiffs-Appellees.

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

**LUCERO**, Circuit Judge.

This diversity case requires us to address the contours of covenants not to compete under Oklahoma law. When John R. Sappington and William B. Emmer defected from one Tulsa-area metals business, Southwest Stainless, to another, Rolled Alloys, they took with them years of expertise in the metals industry and personal relationships with many area customers. Some years before, Southwest Stainless had been involved in a merger, and Sappington and Emmer had signed noncompetition agreements that purported to restrict their ability to work for competitors in the area. When Southwest Stainless lost business to Rolled Alloys following Sappington's and Emmer's defections, it sued for breach of these agreements and a number of related claims.

After trial, Southwest Stainless succeeded on a handful of these claims and was granted an injunction ordering Sappington and Emmer to abide by the noncompetition agreements for a year following judgment. Rolled Alloys appeals, arguing that even on these claims, Southwest Stainless failed to connect its alleged loss of business to the defendants' actions. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the damages and injunction arising from the noncompetition agreements and reverse damages for misappropriation of trade secrets.

# I

Southwest Stainless, L.P., is a metals manufacturer formed by the merger of three metals businesses known collectively as the Metals Group or Metals.[1] When the Metals Group was acquired by HD Supply, Inc., in 1997, among its owners were Sappington, Emmer, and Ronald L. Siegenthaler. All three men were based in Tulsa, Oklahoma. As a condition precedent to the acquisition agreement, each signed contracts agreeing that, in the event he left the employment of the Metals Group, he would not "engage in any business within the States of Missouri, Texas, Oklahoma, Tennessee, Louisiana, Alabama, and Florida . . . which competes in any manner with any business conducted by any constituent corporation of the Metals Group" for a period of one year (the "Noncompetition Agreements").[2] Sappington and Emmer also entered into agreements to remain with the company for three years following the acquisition (the "Employment Agreements").[3]

---

[1] Despite the merger and subsequent acquisition, the parties and the district court commonly refer to the Southwest Stainless business as "Metals" or "the Metals Group." We follow their lead.

[2] The Noncompetition Agreements also covered the first three years following the closing date of the sale, but that period is not at issue in this case. In addition, the district court determined prior to trial that Oklahoma law governs the Noncompetition Agreements, thus "[a]s to the Noncompete Provisions' seven-state geographic restriction, the Court must limit enforcement to Tulsa County and those counties surrounding Tulsa County."

[3] The parties also stipulated that Siegenthaler entered into a "Consulting

(continued...)

Rolled Alloys, Inc., also competes in the Tulsa metals market. Prior to the events at issue in this case, however, it sold products to Tulsa customers but did not have an office in the area. In the 1990s, the Metals Group and Rolled Alloys both competed for customers and worked together on sales in which Metals served as a middleman for Rolled Alloys' products.

For about three years after the acquisition, Siegenthaler consulted for the Metals Group. More than a year before the events relevant to the case at hand, however, he stopped consulting for Metals and took a hiatus from the metals industry. During this period, he operated a consulting company, Myriad Technologies. However, by 2006, Siegenthaler began to contemplate returning to the metals industry and, in particular, opening a Rolled Alloys office in Tulsa. In October 2006, he entered into a business relationship with Rolled Alloys to open a fully functional Rolled Alloys office in Tulsa. Later that same month, he leased space for the office, and by February 2007 he was making sales calls.

Shortly thereafter, both Sappington and Emmer left Metals for Rolled Alloys. On Friday, March 9, 2007, Emmer resigned from the Metals Group, and on the following Monday he started working as an "inside" salesperson in Rolled Alloys' Tulsa office. A month later, on April 9, Sappington submitted his letter

---

[3](...continued)
Agreement" at the time, but the record does not reflect its contents and it is not relevant to this appeal.

of resignation to Metals and started working at Rolled Alloys as an "outside" salesperson later that same day.  In metals industry parlance, "inside" salespeople price quotes and fill orders, while "outside" salespeople work directly with and call on customers.

After Emmer and Sappington began working in Rolled Alloys' Tulsa office, Rolled Alloys won business from Tulsa-area customers who had, in the past, placed orders with the Metals Group.[4]  Of particular relevance to this appeal are orders placed by two Tulsa-area customers, Cust-o-Fab and Hughes Anderson.  At trial, Emmer denied helping prepare quotes for Cust-o-Fab or any other Oklahoma customers.  However, faced with documents showing some handwritten figures for a Cust-o-Fab order, Emmer acknowledged, "[I]t does look like my writing, but I have no recollection of that at all."  A Metals employee who had worked with Emmer prior to his departure also identified his handwriting on the documents.  The documents reflect that Cust-o-Fab placed a $449 order with Rolled Alloys.  Historically, Metals had averaged a 40% profit margin on Cust-o-Fab orders.

Similarly, Sappington never acknowledged at trial that he worked on Hughes Anderson orders after he left Metals for Rolled Alloys.  However, he did recall helping Owen Thornton, a salesperson at Metals, price a Hughes Anderson

---

[4] This is not to say that the customers stopped doing business with the Metals Group completely; it continued to win some business from these customers after Sappington and Emmer departed.

order shortly before Sappington moved to Rolled Alloys. According to Thornton, Sappington instructed him to lower the price on certain items, resulting in a quote of $208,900. Thornton submitted the resulting quote to Hughes Anderson, but on April 12, 2007—the same week Sappington started work at Rolled Alloys—Hughes Anderson placed the order with Rolled Alloys for $208,044. If Hughes Anderson had selected Thornton's quote, Metals would have made $31,200 in profit.

Invoking the federal courts' diversity jurisdiction, Southwest Stainless sued Rolled Alloys, Siegenthaler, Sappington, and Emmer on June 14, 2007.[5] In its amended complaint, Southwest Stainless alleged: (1) breach of the Noncompetition Agreements and Employment Agreements, (2) breach of the acquisition agreement, (3) interference with business relations, (4) breach of fiduciary duty of loyalty, (5) interference with contractual relations, and (6) misappropriation of trade secrets. In an opinion and order prior to trial, the district court granted partial summary judgment on certain key questions of law: (1) Oklahoma law governs the interpretation of the Noncompetition Agreements,[6] (2) defendants were entitled to summary judgment as to claims arising out of the

---

[5] For simplicity's sake, we will use "Rolled Alloys" or "the defendants" to refer to all four defendants.

[6] As noted above, the district court also determined that, under Oklahoma law, "[a]s to the Noncompete Provisions' seven-state geographic restriction, the Court must limit enforcement to Tulsa County and those counties surrounding Tulsa County."

Employment Agreements, as these agreements expired by their own terms prior to the events in question, and (3) defendants were entitled to summary judgment as to claims arising out of the Acquisition Agreement, as all its relevant conditions had been satisfied. On the remaining claims, the district court concluded that genuine issues of material fact existed for trial. The parties agreed on a pretrial order identifying twelve contested issues of law and fifty-seven contested issues of fact.

After a three-day bench trial, the district court issued a fifty-six page opinion and order, reaching 197 conclusions of fact and 54 conclusions of law. In its order entering judgment, the court found in favor of plaintiffs as to the following claims: (1) breach of the Noncompetition Agreements against Sappington and Emmer, (2) breach of fiduciary duty of loyalty against Sappington, (3) interference with contractual relations against Siegenthaler and Rolled Alloys, and (4) misappropriation of trade secrets against Sappington and Rolled Alloys. On all other claims, the court entered judgment in favor of the defendants. In ordering relief, the court found the actual damages for these claims to be duplicative, and damages of $180 for the claims related to the Cust-o-Fab order and $31,200 for the claims related to the Hughes Anderson order. However, for the misappropriation of trade secrets claims, it found that Sappington and Rolled Alloys had willfully and maliciously misappropriated Southwest Stainless' Hughes Anderson quote and ordered an additional $31,200

in exemplary damages.  In addition, because it found that Sappington and Emmer had been in breach of the Noncompetition Agreements since leaving Metals, it ordered injunctive relief "permanently restrain[ing them] for a period of one (1) year . . . from directly or indirectly . . . engaging in any business within Tulsa, Rogers, Wagoner, Okmulgee, Creek, Pawnee, Osage and Washington Counties, Oklahoma, which competes in any manner with any business conducted by plaintiffs Southwest Stainless, L.P. or HD Supply, Inc."

Sappington, Emmer, Siegenthaler, and Rolled Alloys timely appealed.

## II

On appeal, Rolled Alloys raises twelve issues challenging aspects of each and every entry of judgment and the ordered relief.  Our standard of review is the same for the majority of the challenges:  "In an appeal from a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo."[7]  Weyerhaeuser Co. v. Brantley, 510 F.3d 1256, 1260 (10th Cir. 2007) (quotation omitted).  "A finding of fact is 'clearly erroneous' if it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made."  Id. at 1262 (quotation omitted).  In conducting this review, "[w]e view the evidence in the light most favorable to the district court's ruling and must uphold any district

---

[7] We discuss the standard of review applicable to the permanent injunction in Part II.D, infra.

court finding that is permissible in light of the evidence." Id. "While we review the amount of a damage award for clear error, the methodology a district court uses in calculating a damage award, such as determining the proper elements of the award or the proper scope of recovery, is a question of law we review de novo." FTC v. Kuykendall, 371 F.3d 745, 763 (10th Cir. 2004) (quotation and brackets omitted). The parties do not challenge the district court's decision that Oklahoma law governs.

**A**

Regarding the damages awarded for breach of the Noncompetition Agreements, Rolled Alloys raises two challenges on appeal: (1) that Sappington's and Emmer's breaches did not cause damage to Metals, and (2) that the district court used improper methods in calculating damages. We address each in turn.

**1**

A thread common to many of the issues Rolled Alloys raises on appeal is that the district court committed clear error in concluding that Sappington caused Metals to lose the Hughes Anderson order and Emmer caused Metals to lose the Cust-o-Fab order. It makes three interrelated arguments on this front: that it was contradictory for the district court to conclude that Metals failed to show that it lost general profits to Rolled Alloys and yet find that it had lost these specific orders; that unless the district court identified how Sappington and Emmer caused the damages, it could not conclude that they had actually caused these damages;

- 9 -

and that Metals could not prove that Rolled Alloys caused it to lose these orders unless it proved that it would have otherwise won the orders. We are unpersuaded.

Under Oklahoma law, "[i]n order for damages to be recoverable for breach of contract they must be clearly ascertainable, in both their nature and origin, and it must be made to appear they are the natural and proximate consequence of the breach and not speculative and contingent." Florafax Int'l, Inc. v. GTE Mktg. Res., Inc., 933 P.2d 282, 296 (Okla. 1997). However, "[a] claim for lost profits need not be proven with absolute certainty: 'In essence, what a Plaintiff must show for the recovery of lost profits is sufficient certainty that reasonable minds might believe from a preponderance of the evidence that such damages were actually suffered.'" Boatsman v. Sw. Bell Yellow Pages, Inc., 30 P.3d 1174, 1177 (Okla. Civ. App. 2001) (quoting Florafax Int'l, Inc., 933 P.2d at 296) (brackets omitted). Under this standard, the district courts' findings are supported by the record.

We agree with Rolled Alloys that "internally inconsistent findings constitute clear error." John Allan Co. v. Craig Allen Co., LLC, 540 F.3d 1133, 1139 (10th Cir. 2008). We do not agree that the district court made such inconsistent findings in this case. Rolled Alloys emphasizes that, at trial, the court stated, "[The plaintiffs] want me to infer that all the damages from the breach are all the profits that Rolled Alloys made from the Tulsa customers since

- 10 -

these gentlemen joined Rolled Alloys. And I think I would have to make a leap of faith there." Similarly, in its findings of fact, the district court concluded:

> [P]laintiffs are not entitled to general lost profit damages from Sappington and Emmer. Plaintiffs failed to prove by a preponderance of the evidence that Sappington's and Emmer's employment with Rolled Alloys and/or conduct caused any of the general lost profits. The claimed lost profits are based on sales that Rolled Alloys made, but the record contains no evidence that Metals would have made these profits had the Noncompetition Agreements not been breached.

Rolled Alloys argues that it was contradictory to thereafter conclude that Sappington caused $31,200 in damages related to the Hughes Anderson order and Emmer caused $180 in damages related to the Cust-o-Fab order.

Intentionally or not, the defendants ignore the distinction the district court made, both in its statement at trial and in its findings of fact, between general lost profits and profits lost on specific orders. We conclude that it was not contradictory for the district court to decide that it was "speculative and contingent" to infer that Metals would have won all of the business of Rolled Alloys' Tulsa-area customers but for Sappington and Emmer breaching the Noncompetition Agreements, while simultaneously concluding that a preponderance of the evidence showed that their breaches led Metals to lose the individual Hughes Anderson and Cust-o-Fab orders. The general profits Metals claimed to have lost were the sum of every order Rolled Alloys won from the sixteen Tulsa-area customers also served by Metals. In rejecting Metals' claim

- 11 -

for general lost profits, the district court merely concluded that it had not proven it would have won all of this business. To conclude that it had shown it would have won some of this business is not contradictory. Thus, this argument does not provide a basis for concluding that the district court's findings were clearly erroneous.

In the absence of internal inconsistencies in the district court's findings, we conclude that the record shows a "sufficient certainty that reasonable minds might believe from a preponderance of the evidence that [the damages awarded for the Hughes Anderson and Cust-o-Fab orders] were actually suffered." Florafax Int'l, Inc., 933 P.2d at 296. With respect to the Hughes Anderson order, the district court concluded that "Sappington must have disclosed, or directly or indirectly worked on, the Hughes Anderson order at Rolled Alloys, a direct violation of Sappington's Noncompetition Agreement." There is ample evidence in the record supporting this conclusion: Hughes Anderson placed the order with Rolled Alloys mere days after Sappington defected; Sappington acknowledged helping price Metals' quote before he left; in the decade proceeding Sappington's departure, Metals had lost just one Hughes Anderson order to Rolled Alloys; Sappington was very friendly with Rich Gustafson, a purchasing contact at Hughes Anderson; and, perhaps most damningly, Rolled Alloys' bid was just $856 less than that of Metals.

Rolled Alloys argues that even if the record supports the conclusion that

Sappington "must have" worked on the Hughes Anderson order, damages cannot be awarded unless the district court can conclude "what Sappington purportedly did" and "how the $31,200 in damages had purportedly resulted." Neither of these arguments defeats the district court's findings. A "[c]ausal connection may be proved by circumstantial evidence," provided the evidence has "sufficient probative force to constitute the basis for a legal inference, rather than mere speculation, and the circumstances proved . . . lead to the conclusion with reasonable certainty and probability." Martin v. Stratton, 515 P.2d 1366, 1371 (Okla. 1973). The district court did not merely speculate that Sappington caused Metals to lose the order; rather it concluded that he must have caused Metals to the lose the order. The evidence cited above is plainly sufficient to support this legal inference.

Similarly, Metals put on evidence that it submitted a quote just $856 more than Rolled Alloys' quote. This is sufficient for the district court to have concluded that Metals would have won the order but for Sappington's involvement in Rolled Alloys.[8] Indeed, Sappington himself testified, "[Gustafson

---

[8] Rolled Alloys also argues here that this specific conclusion is internally inconsistent with the district court's conclusion that "[e]ven when Metals submitted a lower bid . . . that did not guarantee business." As discussed above, because the district court reached this conclusion in reference to Metals' claims that it was entitled to damages for all business won by Rolled Alloys, it is not inconsistent with the conclusion that, with respect to this particular order, Metals would have won the order if it had the lowest bid.

- 13 -

has] always been very concerned about pricing.  So what he was doing, I'm assuming, [wa]s placing an order with the low bidder."  Finally, the district court identified the factual basis for the profit margin used in its damages calculation on testimony that the actual Metals' quote at issue used a 15% profit margin.  Thus, we conclude that the district court did not clearly err in determining that Sappington's breach caused $31,200 in damages arising from the Hughes Anderson order.

The record regarding the Cust-o-Fab order is thinner, but it is not "without factual support in the record"; we are not "left with a definite and firm conviction that a mistake has been made" in determining that Emmer's breach of the Noncompetition Agreement led to $180 in damages.  See Weyerhaeuser Co., 510 F.3d at 1262 (quotation omitted).  Although a plaintiff seeking damages must show lost profits with "sufficient certainty that reasonable minds might believe from a preponderance of the evidence that such damages were actually suffered," Florafax Int'l, Inc., 933 P.2d at 296, we are guided by the general principle that what showing is "sufficient" can depend on the amount at stake, cf. Manouchehri v. Heim, 941 P.2d 978, 984 (N.M. Ct. App. 1997).

Emmer himself identified figures in his handwriting on the Rolled Alloys quote for the order, and a Metals employee who had worked with Emmer described those figures as "deliberately undercut[ting]" the Metals pricing with which Emmer was intimately familiar.  Although the record does not show that

- 14 -

Metals bid on this specific order, undisputed testimony established that Metals bid on at least 75% of the orders Cust-o-Fab eventually placed with Rolled Alloys. This evidence permitted the district court to conclude that it was more likely than not that Metals bid on this order. See Florafax Int'l, 933 P.2d at 296 ("[F]or the recovery of lost profits [a plaintiff must show by] a preponderance of the evidence that such damages were actually suffered."). That same witness testified that Metals' average profit margin on Cust-o-Fab orders was 40%. Thus, the $180 in damages assessed for the Cust-o-Fab order was not clearly erroneous.

**2**

Having concluded that, as a factual matter, the district court's conclusion that Sappington's and Emmer's breaches damaged Metals was not clearly erroneous, we turn to the question of whether it used proper methodologies in calculating the damages awarded for these breaches.[9] "[T]he methodology a district court uses in calculating a damage award . . . is a question of law we review de novo." Kuykendall, 371 F.3d at 763 (quotation omitted). Under the applicable Oklahoma law,

> the measure of [contract] damages . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. No damages can be recovered for a breach

_____

[9] It is unclear whether Rolled Alloys challenges the methodology used for both orders, or only the Cust-o-Fab order. Out of an abundance of caution, we address both.

of contract, which are not clearly ascertainable in both their nature and origin.

Okla. Stat. tit. 23, § 21 (footnote omitted); see also Florafax Int'l, 933 P.2d at 296 (applying title 23, § 21 to lost profits). While the amount of lost profits "may not be based on mere speculation, conjecture and surmise alone, the mere uncertainty as to the exact amount of damages will not preclude the right of recovery. It is sufficient if the evidence shows the extent of damage by just and reasonable inference." Florafax Int'l, 933 P.2d at 296 (citations omitted). Under these general principles, we discern no legal error in the methods used by the district court.

Regarding the Hughes Anderson order, the district court assessed the $31,200 in damages based on Thornton's testimony that Metals' bid of $208,900 included a 15% profit margin. Given that the district court concluded that Hughes Anderson would have selected this Metals quote but for Sappington's breach, this method of calculating the damage is plainly proper: It simply awarded the profits that, as a factual matter, Metals would have made on the order.[10] We decide that these are damages that, "in the ordinary course of things, would be likely to result" from this breach. Okla. Stat. tit. 23, § 21.

---

[10] In fact, the 15% profit margin used is less than Metals' historical average profit margin of 20%-25% on Hughes Anderson orders. Using historical average profit margins is another acceptable methodology for calculating lost profits. See Florafax Int'l, 933 P.2d at 297.

To calculate the profits lost on the Cust-o-Fab order, the district court based its award on Metals' average profit margin of 40% on Cust-o-Fab orders. The "track record" of a business "clearly [i]s appropriate to consider on the issue of the extent of lost profits." Florafax Int'l, 933 P.2d at 297; see also Boatsman, 30 P.3d at 1178 (lost profits may be "extrapolate[d]" from business done before the breach). This 40% figure was based on the recent history of Metals' business with Cust-o-Fab, according to the testimony of a Metals employee who had worked with Cust-o-Fab for ten to fifteen years.[11] The defendants argue that the district court erred because it multiplied this margin by "the amount of revenue Rolled Alloys received from that sale," rather than what Metals might have received for the order. However, because Rolled Alloys won this business because it underbid Metals, this method simply awarded damages at the very bottom of the range "likely to result" from the breach. See Okla. Stat. tit. 23, § 21. Thus, we conclude that the district court used acceptable methods in calculating the damages for these claims.

---

[11] In arguing against the methodology used by the district court, the defendants assert that this 40% figure is inconsistent with other findings regarding Metals' profit margins generally. For the reasons discussed above, this figure for a specific customer is not inconsistent with the district court's findings regarding customers generally. However, we also note that this argument does not address the methodology used, but rather the factual basis for the figures to which the method is applied. Thus, we only review the figures for clear error.

**B**

Rolled Alloys also attacks the district court's factual conclusions regarding whether Sappington was liable for tortious interference with business relations or breached his fiduciary duty of loyalty to Metals, whether Siegenthaler and Rolled Alloys were liable for tortious interference with contractual relations, and whether Metals is entitled to damages on these claims. It acknowledges that, as with the breach of contract claims, we review the district court's conclusions on these issues for clear error. Weyerhaeuser Co., 510 F.3d at 1260. Contrary to Rolled Alloys assertions, however, we discern "factual support in the record" for all but one of the district court's factual conclusions and are not "left with a definite and firm conviction that a mistake has been made." Id. at 1262.

**1**

We need not address the merits of Rolled Alloys' argument that Sappington is not liable for tortious interference with business relations. We acknowledge that in its opinion and order preceding judgment, the district court stated, "The [c]ourt finds, therefore, that plaintiffs are entitled to recover from Sappington [for tortious interference] the $31,200 in profits they had a reasonable assurance of realizing on the Hughes Anderson quote." However, when it entered judgment, the district court entered judgment in favor of Sappington and Emmer on this claim. Thus, there is no relief to be granted on appeal.

- 18 -

**2**

Rolled Alloys' argument that the district court erred in concluding that Sappington breached a fiduciary duty he owed to Metals is not persuasive. As Rolled Alloys openly acknowledges, it only challenges the factual basis for this conclusion and adopts the same argument it makes in challenging the factual basis for the district court's conclusions regarding Sappington's breach of the Noncompetition Agreement. For the reasons described above, see Part II.A, supra, the record supports the district court's factual findings regarding Sappington's role in the Hughes Anderson order. We also discern no error in the district court's conclusion that these damages were not "separate and distinct from those sought" by Metals for breach of contract. See United Phosphorus, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1235 (10th Cir. 2000). Thus, we affirm the district court's assessment of duplicative damages on the basis of breach of fiduciary duty.[12]

---

[12] This is not to say that breach of contract and breach of fiduciary duty have identical factual requirements. Whether Sappington owed Metals a fiduciary duty is, in part, a question of fact. See Enter. Mgmt. Consultants, Inc. v. State ex rel. Okla. Tax Comm'n, 768 P.2d 359, 362 (Okla. 1988) ("The law does not presume an agency status is present. The burden of proving the existence, nature and extent of the agency relationship rests ordinarily upon the party who asserts it."). However, the defendants do not challenge on appeal the conclusion that Sappington owed Metals such a duty.

**3**

Rolled Alloys next challenges the district court's conclusion that Siegenthaler and Rolled Alloys are liable for tortious interference with contract. Arguing that "[t]his is precisely the same standard articulated by the District Court with regard to Metals' claim of tortious interference with business," Rolled Alloys asserts that the district court could not logically find for the defendants on that claim but for the plaintiffs on this claim. The defendants' argument misapprehends the district court's basis for finding in favor of the plaintiffs on this claim of contract interference.

Rolled Alloys is correct that the standard for interference with contract or business relations is the same: A plaintiff must show that: (1) "[it] had a business or contractual right that was interfered with"; (2) "the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable"; and (3) "damage was proximately sustained as a result of the complained-of interference." Mac Adjustment, Inc. v. Prop. Loss Research Bureau, 595 P.2d 427, 428 (Okla. 1979). Rolled Alloys' argument fails, however, because it assumes that the same relationship is at issue in both claims. In Metals' claim against Sappington and Emmer for interference, it alleged that they interfered with Metals' business relationship with its customers. Metals' claim against Siegenthaler and Rolled Alloys, on the other hand, is for their interference with its contractual relationship with Sappington and Emmer. Thus, it is not

- 20 -

contradictory to reach opposite conclusions with respect to these claims.

We also conclude that there is sufficient record support for the district court's finding of liability against Siegenthaler and Rolled Alloys on this claim. Metals undisputedly had contractual relationships with Sappington and Emmer: the Noncompetition Agreements. The defendants were aware of these agreements and nonetheless hired Sappington and Emmer away from Metals to work in their Tulsa office. Further, Sappington's and Emmer's departures from Metals for Rolled Alloys proximately caused Metals to lose the Hughes Anderson and Cust-o-Fab orders to Rolled Alloys. See Part II.A, supra. Thus, the district court did not err in concluding that the defendants interfered with Metals' contractual relations with Sappington and Emmer.

**4**

We need not linger on Rolled Alloys' argument that the district court erred in awarding damages for the Hughes Anderson and Cust-o-Fab orders under these claims. As it openly acknowledges, it incorporates by reference the same argument it made regarding breach of contract for these claims. For the reasons discussed above, see Part II.A, supra, the district court did not err in assessing these damages.

**C**

Rolled Alloys is on stronger footing in its appeal regarding the misappropriation of trade secrets. At issue is whether Metals' pricing information

qualifies as a trade secret under the Oklahoma Uniform Trade Secrets Act

("OUTSA").  See Okla. Stat. tit. 78, § 85 et seq.  Here, the district court

concluded that a specific piece of information, the Hughes Anderson quote, was a

trade secret misappropriated by Sappington and Rolled Alloys.  Rolled Alloys

argues that this information does not qualify as a trade secret because Metals

disclosed this information to its customers without reservation.  We agree.

> OUTSA defines a trade secret as:
>
> information, including a formula, pattern, compilation, program,
> device, method, technique or process, that:
>
> a.  derives independent economic value, actual or potential, from not
> being generally known to, and not being readily ascertainable by
> proper means by, other persons who can obtain economic value from
> its disclosure or use, and
>
> b.  is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

Id. § 86(4).  As a general matter, "[c]onfidential data regarding operating and

pricing policies can . . . qualify as trade secrets."  Black, Sivalls & Bryson, Inc. v.

Keystone Steel Fabrication, Inc., 584 F.2d 946, 952 (10th Cir. 1978).  In

evaluating a specific claim, however:

> Oklahoma has adopted six factors from the Restatement of Torts to
> help determine whether information is a trade secret:  (1) the extent
> to which the information is known outside of the business; (2) the
> extent to which the information is known by employees and others
> involved in the business; (3) the extent of measures taken by the
> business to guard the secrecy of the information; (4) the value of the
> information to the business and to competitors; (5) the amount of
> effort or money expended by the business in developing the

information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Australian Gold, Inc. v. Hatfield, 436 F.3d 1228, 1245 (10th Cir. 2006) (citing Amoco Prod. Co. v. Lindley, 609 P.2d 733, 743 (Okla. 1980)).

Although the district court did not identify these factors specifically, it placed great emphasis on the measures that Metals takes to keep its pricing information confidential: Employees sign confidentiality agreements, passwords are used to restrict access to company information, employees are regularly reminded of the confidential nature of company information, and Metals has spent hundreds of thousands of dollars accumulating and maintaining its confidential information. In addition, the court noted that Sappington, Emmer, and Siegenthaler believed pricing information to be a trade secret during their time at Metals. We agree that each of these facts weighs in favor of finding a trade secret.

We nonetheless conclude that these facts do not establish enough. They establish that Metals takes general measures to keep its company information private. However, the district court also made factual conclusions showing that this is not always the case. With respect to pricing in particular, it found that "[s]ome customers which regularly place large orders may order using monthly-updated 'posted pricing,' which allows the customers to know prices on certain items in advance"; "[c]ustomer feedback reveals how competitors are pricing their

- 23 -

products"; and "Metals does not prevent its customers and vendors from disclosing pricing information to others." Thus, regardless of the measures noted by the district court, it is apparent that not every piece of Metals' "confidential" information constitutes a trade secret. See Black, Sivalls & Bryson, Inc., 584 F.2d at 951 ("[I]nformation which had been published or otherwise disseminated . . . . cannot qualify as [a] trade secret[] . . . .").

Because not all of Metals' company and pricing information qualifies as trade secrets, we look to the record to see whether Metals has established that the Hughes Anderson quote in particular was protected. The burden is upon the party claiming OUTSA protection to show the existence of the trade secret. Australian Gold, Inc., 436 F.3d at 1245. We see no such evidence in the record. To the contrary, the district court concluded both that "Metals does not prevent its customers and vendors from disclosing pricing information to others" and that Metals had "submitted a second quote to Hughes Anderson for $208,900." Thus, Hughes Anderson had at its disposal the "secret" information at issue, and it was free to share that information with Rolled Alloys. Accordingly, critical factors weigh against concluding that the Hughes Anderson quote was a trade secret: The bid was known outside of Metals, Metals took no measures to prevent Hughes Anderson from disseminating the information, and Rolled Alloys could properly

acquire the information simply by requesting it from Hughes Anderson.[13]

As the Supreme Court has explained,

> Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others. . . . If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished.

Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984) (citations omitted). Metals disclosed the quote to Hughes Anderson and openly admits that Hughes Anderson was under no obligation to keep the information confidential. We thus conclude that the district court erred in determining that the quote constituted a trade secret and reverse its judgment in favor of the plaintiffs on this claim.

**D**

Rolled Alloys' remaining arguments address the injunctive relief granted by the district court. It challenges the injunction on two fronts. It first argues that the district court erred in concluding that Metals had prevailed on the merits—that is, that Metals proved Sappington and Emmer breached the Noncompetition Agreements. It then argues that, notwithstanding the merits of

---

[13] That Rolled Alloys could properly acquire the Hughes Anderson quote by requesting it from the customer weighs against it being a trade secret regardless of whether this is how Rolled Alloys actually acquired the information. See Black, Sivalls & Bryson, Inc., 584 F.2d at 951. Thus, this factor does not contradict the district court's finding that Rolled Alloys actually acquired the information via Sappington.

the breach, the district court erred in concluding that Metals would suffer irreparable harm unless granted injunctive relief. We disagree.

"For a party to obtain a permanent injunction, it must prove: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 822 (10th Cir. 2007). When a district court grants a permanent injunction, we review that decision for abuse of discretion. FTC v. Accusearch Inc., 570 F.3d 1187, 1201 (10th Cir. 2009). "The district court's discretion in this context is necessarily broad and a strong showing of abuse must be made to reverse it." Id. (quotation omitted).

**1**

We first reject Rolled Alloys' first argument that Metals failed to show success on the merits. Under the Noncompetition Agreements, Sappington and Emmer agreed not to "engage in any business within the States of Missouri, Texas, Oklahoma, Tennessee, Louisiana, Alabama, and Florida . . . which competes in any manner with any business conducted by any constituent corporation of the Metals Group" for a period of one year. Prior to trial, the district court determined that under Oklahoma law, the agreements were only enforceable as to competition within "Tulsa County and those counties

- 26 -

surrounding Tulsa County." But Rolled Alloys does not dispute that Hughes Anderson and Cust-o-Fab are Tulsa-area customers, nor that Rolled Alloys and Metals compete for their business. Rather, it argues that, for the same reasons discussed above, Metals failed to show that Sappington and Emmer worked on these orders. Because we reject this assertion, see Part II.A, supra, Metals has shown actual success on the merits as required for injunctive relief.[14]

## 2

Rolled Alloys' final argument is that injunctive relief is inappropriate because the district court erred in concluding that Metals would suffer irreparable harm without such relief. Specifically, the defendants argue that because Metals still conducted some business with the Tulsa-area customers at issue after Sappington and Emmer joined Rolled Alloys, Metals was not suffering irreparable harm. We disagree.

A district court may find irreparable harm "based upon evidence suggesting that it is impossible to precisely calculate the amount of damage plaintiff will suffer." Equifax Servs., Inc. v. Hitz, 905 F.2d 1355, 1361 (10th Cir. 1990)

---

[14] Because it urges us to conclude that Sappington and Emmer did not work on these orders, Rolled Alloys then argues that they did not breach the contract merely by being employed in Tulsa while serving only customers outside Oklahoma. Having concluded that Sappington and Emmer served Tulsa-area customers also served by Metals—actions plainly prohibited by the Noncompetition Agreements—we decline Rolled Alloys' invitation to opine on the outermost boundaries of what it means to "engage in any [competing] business."

(quotation and alterations omitted). Oklahoma describes an injury as "irreparable when it is incapable of being fully compensated for in damages or where the measure of damages is so speculative that it would be difficult if not impossible to correctly arrive at the amount of the damages." Hines v. Indep. Sch. Dist. No. 50, 380 P.2d 943, 946 (Okla. 1963). One such situation in which damages may not fully compensate a plaintiff is when the business at issue "is based on personal contacts and a knowledge of the special needs and requirements of customers, a fact which complicates any damage estimate." Equifax Servs., Inc., 905 F.2d at 1361 (quotation and citation omitted). As found by the district court, such are precisely the circumstances at issue here: Sappington and Emmer were long-standing and respected players in the Tulsa metals market, and because of this, the customers' goodwill toward them was a valuable commodity. It is the value of this goodwill that the Noncompetition Agreements were designed to protect, and the incalculable damage to that goodwill can constitute irreparable harm.

Rolled Alloys further argues that because the district court concluded that Metals was not entitled to damages for general lost profits, it was contradictory for it to then conclude there was irreparable harm. We read the district court's opinion to stand for exactly the opposite. Because it is so difficult to prove the value of goodwill—as illustrated by Metals' difficulty in proving damages—the type of injury noncompetition agreements are designed to prevent is suited to

- 28 -

injunctive relief in cases such as this. <u>See</u> <u>id.</u> We thus discern no abuse of discretion in the district court's judgment that, having breached the Noncompetition Agreements during the initial one year time period, Sappington and Emmer must now abide by their terms for a year from judgment.

### III

For the foregoing reasons, we **AFFIRM** the district court's entry of judgment in favor of the plaintiffs on the breach of contract, breach of fiduciary duty, and tortious interference with contract relations claims. In addition, we **AFFIRM** the entry of injunctive relief. We **REVERSE** and **REMAND** for entry of judgment in favor of the defendants on the claim for misappropriation of trade secrets.