**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 18, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

HUSKY VENTURES, INC.,

      Plaintiff Counterclaim Defendant - Appellee,

v.

B55 INVESTMENTS, LTD.,

      Defendant Counterclaimant - Appellant,

and

CHRISTOPHER McARTHUR, an individual,

      Defendant - Appellant.

No. 17-6034

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:15-CV-00093-F)**

---

Stephen E. Csajaghy (Marisa Hudson-Arney with him on the briefs), Condit Csajaghy LLC, Denver, Colorado, for Defendants-Appellants.

Shannon Wells Stevenson, Davis Graham & Stubbs LLP, Denver, Colorado, (Kyle W. Brenton and Daniel Rosales, Davis Graham & Stubbs LLP, Denver, Colorado, and Travis P. Brown, Brady L. Smith, John Paul Albert, Mahaffey & Gore, P.C., Oklahoma City, Oklahoma, with him on the briefs) for Plaintiff-Appellee.

---

Before **HOLMES**, **MATHESON**, and **MORITZ**, Circuit Judges.

_____

**HOLMES**, Circuit Judge.

_____

Husky Ventures, Inc. ("Husky") sued B55 Investments Ltd. ("B55") and its president, Christopher McArthur, for breach of contract and tortious interference under Oklahoma law. In response, B55 filed counterclaims against Husky.[1] After a trial, a jury reached a verdict in Husky's favor, awarding $4 million in compensatory damages against

---

[1] Before the district court, B55 and Mr. McArthur at least once referenced "their" counterclaims. *See* Aplts.' App., Vol. XI, at 2843 (Defs.' Mot. to Postpone Trial and Allow Defs. Time to Amend Their Counterclaims, filed Oct. 27, 2016). On appeal, in their jointly filed brief, B55 and Mr. McArthur refer to actions taken "collectively" by them as actions taken by "B55" and, more specifically, consistently refer to the counterclaims as being asserted solely by B55. Aplts.' Opening Br. at 1; *see, e.g.*, *id.* at 3 ("Did the District Court err by denying B55's repeated attempts to amend its counterclaims prior to trial?"); *id.* at 46 ("The District Court Erred by Denying B55's Attempts to Amend Its Counterclaims."). On the other hand, in its appellate briefing, Husky styles the counterclaims as attributable solely to Mr. McArthur. *See, e.g.*, Aplee.'s Resp. Br. at 52 ("[Mr.] McArthur did not demonstrate good cause to amend his counterclaims on the eve of trial." (capitalization and emphasis omitted)). To dispel any possible confusion sown by the parties' briefing, we referenced key district court filings that necessarily should reflect the true identity of the proponent or proponents of the counterclaims. These filings generally style the counterclaims as being brought solely by B55. *See, e.g.*, Aplts.' App, Vol. II, at 560 (Am. Answer & "Counterclaims of Defendant [B55]," dated June 29, 2015); *id.*, Vol. X, at 2638 (Final Pretrial Report, dated Oct. 11, 2016) (describing B55's "four counterclaims in this case"); *id.*, Vol. XII, at 3115–16 (Verdict Form, dated Nov. 22, 2016) (making findings on "B55's fraud and negligent misrepresentation counterclaims"). Therefore, although we attribute appellate arguments for reversal (in their joint briefing) as being advanced by both B55 and Mr. McArthur, we generally characterize the counterclaims themselves, and the requests to amend them, as being advanced by B55 alone. Most importantly, we note that our analysis of the parties' arguments concerning the counterclaims does not turn in any material respect on whether the counterclaims were filed by both B55 and Mr. McArthur or only by B55; this factor is irrelevant to our resolution of the appellate issues related to the counterclaims.

both B55 and Mr. McArthur and $2 million in punitive damages against just Mr. McArthur; the jury also rejected the counterclaims presented to it. In further proceedings, the district court entered a permanent injunction and a declaratory judgment in Husky's favor. After the court entered final judgment, B55 and Mr. McArthur filed a timely notice of appeal from that judgment. They also moved for a new trial under Federal Rule of Civil Procedure ("Rule") 59(a) or, in the alternative, to certify a question of state law to the Oklahoma Supreme Court. The court denied the motion in all respects.

On appeal, B55 and Mr. McArthur contend that the district court erred in denying their motion for a new trial and again move to certify a question of state law to the Oklahoma Supreme Court. In addition, they appeal the permanent injunction and declaratory judgment and argue that the district court erred in refusing to grant leave to amend the counterclaims.

We **dismiss** B55 and Mr. McArthur's claims relating to the motion for a new trial for lack of appellate jurisdiction and **deny** their motion to certify the state law question as moot. We **affirm** the district court's judgment on the remaining issues.

**I**

**A**

Husky is an Oklahoma oil and gas company. In the early 2000s, Charles Long, Husky's CEO, became interested in using horizontal drilling techniques to extract oil and gas from geologic formations previously thought to be depleted. In 2008, Husky had success drilling wells at an ostensibly depleted formation called the "Cimarron"

3

prospect.[2]  Encouraged by this promising start, Husky created projects at other prospects, including "Chisholm Trail," "Prairie Grove," "Cherokee Ridge," and "Viking."

But Husky lacked capital to develop each of these projects independently, so it entered into agreements to secure capital with other individuals and companies.  Under these agreements, participating entities would contribute capital in exchange for a working interest in a particular project.  Husky, for its part, was contractually designated as the projects' "operator."  As the operator, Husky was responsible for making operational decisions regarding lease acquisitions and drilling services for each project.  Such arrangements are common in mineral extractive industries.  *See* Debra J. Villarreal & Lucas LaVoy, *Participation Agreements*, 31 E. MIN. L. FOUND. § 10.03 (2010) ("Frequently, companies desiring to pursue an opportunity with other companies do not want to incur liability for the others' obligations. Industry participants, therefore, often prefer to enter into a contract to govern the joint exploration and development rather than form a joint venture."); *see also id.* § 10.03[11] ("Participants typically name one of the participants . . . as the operator for the exploration area. The party named as operator is also often named as the party with primary responsibility for lease acquisition and making development proposals.").

In December 2013, Mr. Long and Mr. McArthur discussed a collaboration between

---

[2]  "A prospect is a geographical area beneath the surface [of the earth] where oil and gas reserves may exist in commercial quantities." *Bokum v. Comm'r*, 58 T.C.M. (CCH) 1183 (T.C. 1990), *aff'd*, 992 F.2d 1136 (11th Cir. 1993).

Husky and B55 in a new oilfield "completion company." Aplts.' App., Vol. XII, at 3139 (Tr. of Jury Trial Proceedings, dated Nov. 14, 2016). Although that company never took form, Husky and B55 signed a Participation Agreement in March 2014 providing for B55's participation in the Viking project. Three months later, the parties executed a separate Participation Agreement for the Prairie Grove project. Under these agreements, B55 became a 15% participant in the Viking project and a 10% participant in the Prairie Grove project. B55 also invested $4.5 million in extant wells and received the right to acquire interests in future oil and gas leases developed by Husky within the project areas.

Signs of trouble quickly emerged. First, Mr. McArthur began making extra-contractual requests that Husky declined to grant. For example, he asked Mr. Long both to make him Husky's CFO and to hire his son to lead Husky's drilling operations. Mr. McArthur also demanded a list of "the name[s], address[es], and phone number[s] of every participant [Husky] ha[d] in every well," which Husky refused to disclose because the information was confidential. *Id.* at 3239–40.

And mere months after executing their 2014 Participation Agreements, B55 and Husky diverged over the meaning of the Agreements' terms. Mr. McArthur claimed that Husky had to offer newly-developed leases to B55 on a lease-by-lease basis and that B55 had the right to opt in to participating in individual leases so offered. Holding this view, Mr. McArthur purported to reject certain leases that Husky had acquired. Husky disagreed with Mr. McArthur's reading of the Participation Agreements and warned B55 that failure to pay its share of the costs for newly-developed leases would forfeit B55's

5

right to participate in future leases.

Around this time, Mr. McArthur demanded that Husky buy out his interests in Prairie Grove and Viking for $25.6 million, more than five times B55's original investment just a few months earlier. Mr. McArthur informed Mr. Long that, if Mr. Long did not agree, Mr. McArthur would cause problems for Husky with service providers and other participants in its projects.

Mr. Long refused. True to his word, Mr. McArthur responded by causing problems for Husky. As a result of Mr. McArthur's efforts, several companies involved in Husky's projects took adverse legal actions against Husky. For example, Mr. McArthur contacted LaMunyon Drilling ("LaMunyon"), a Husky contractor that had drilled wells for Husky's Cimarron, Chisholm Trail, and Prairie Grove projects. At that time, Husky and LaMunyon were in talks to resolve a dispute over billing and the quality of a drilling job that LaMunyon had performed for Husky. Those talks ended, however, after Mr. McArthur convinced LaMunyon not to settle with Husky; instead, at Mr. McArthur's urging, LaMunyon filed liens against a number of Husky's wells.

Under the Participation Agreements, contractors filing liens against Husky's wells could serve as grounds to remove Husky as operator. Mr. McArthur was well aware of this fact. Indeed, he had reached out to Gastar Exploration ("Gastar"), a participant in several of Husky's projects, and offered, in return for over $9 million, to precipitate LaMunyon's filing of liens against a number of Husky's wells so that Gastar could oust Husky as operator. The day after LaMunyon filed its liens, Mr. McArthur sued Husky to

6

remove it as operator of the Prairie Grove project. Gastar, too, notified Husky that it intended to exercise its rights to remove Husky as the operator of the Chisholm Trail and Prairie Grove projects.

Mr. McArthur then approached Torchlight Energy Resources, Inc. ("Torchlight"). He offered to sell Torchlight information that he claimed would prove Husky had engaged in misconduct with respect to its transactions with Torchlight. Torchlight agreed, and it later sued Husky in Texas.

Mr. McArthur's actions had significant negative effects on Husky. Although Husky ultimately settled its differences with Gastar, it was forced to give up its interests in the entirety of Chisholm Trail and a section of Prairie Grove. In addition, all past agreements between Gastar and Husky were terminated, and Husky was deprived of the benefit of Gastar's participation in its other ventures. Together, Gastar's departure and the costs of defending the Gastar suit (as well as the LaMunyon and Torchlight suits) caused Husky to lose several leases and severely limited its ability to drill future wells.

**B**

Husky sued B55 and Mr. McArthur in state court, alleging breach of contract and tortious interference with contract or business relationships under Oklahoma law. Husky sought a declaratory judgment on the contract-interpretation dispute between it and B55 and to quiet title to leases affected by that dispute. It also sought a permanent injunction prohibiting B55 and Mr. McArthur from contacting several of its business partners. And for the harms arising from the interference and breach of contract claims, Husky

requested damages. B55 counterclaimed for breach of contract, declaratory judgment, and fraud.

After the suit was removed to federal court under diversity jurisdiction, a six-day trial ensued. The trial ended with a jury verdict in Husky's favor on its tortious interference claim. On this claim, the jury awarded Husky $4 million in compensatory damages against both B55 and Mr. McArthur and $2 million in punitive damages against Mr. McArthur individually. The jury rejected the fraud counterclaims presented to it.

After the verdict, the district court held more proceedings concerning the requests for a declaratory judgment and a permanent injunction. The court granted Husky a declaratory judgment on the interpretation of the Participation Agreements and issued a permanent injunction prohibiting B55 and Mr. McArthur from contacting Husky's business partners and from further interfering with Husky's business. On January 17, 2017, the court entered final judgment.

Later that month, B55 and Mr. McArthur filed a timely notice of appeal, which identified "the final judgment entered in this action on January 17, 2017," as the decision being appealed. *Id.*, Vol. XXVII, at 6165 (Notice of Appeal, dated Jan. 31, 2017). B55 and Mr. McArthur also moved for a new trial under Rule 59(a) or, in the alternative, to certify a question of state law to the Oklahoma Supreme Court. Relevant to both requests, they argued that Oklahoma law requires individual apportionment of liability as between joint tortfeasors. Hence, B55 and Mr. McArthur claimed that the district court erred by instructing the jury to find a single sum of compensatory damages against them

8

both.  In April 2017, the district court denied the motion in all respects.

## II

On appeal, B55 and Mr. McArthur's first three claims of error concern the district court's order denying their motion for a new trial.  For example, in specifying the appellate issues, they ask: "Did the District Court err by denying B55's *motion for new trial* because of the errors in the verdict form and final judgment which awarded liability on a joint and several basis rather than a several basis?"[3]  Aplts.' Opening Br. at 3 (emphasis added).  Before we consider the merits of these claims, however, we must determine whether we have appellate jurisdiction to do so.  Given that B55 and Mr. McArthur did not file a new or amended notice of appeal addressing this denial of relief, we conclude that we lack appellate jurisdiction over these claims.

## A

---

[3]     More comprehensively, B55 and Mr. McArthur stated the three issues as follows:

> 1.     Did the District Court err by denying B55's *motion for new trial* because of the errors in the verdict form and final judgment which awarded liability on a joint and several basis rather than a several basis?
>
> 2.     Did the District Court err by denying B55's *motion for new trial* because of the errors in the jury instructions concerning the tortious interference with contract or business relationship claim?
>
> 3.     Did the District Court err by denying B55's *motion for new trial* because of the insufficient evidence of damages and the excessive nature of the damages?

Aplts.' Opening Br. at 3 (emphases added).

9

It is well established that "[a] timely-filed notice of appeal is 'mandatory and jurisdictional.'" *Yost v. Stout*, 607 F.3d 1239, 1242 (10th Cir. 2010) (quoting *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 203 (1988)). Under Federal Rule of Appellate Procedure ("Appellate Rule") 3(c)(1)(B), the notice of appeal must "designate the judgment, order, or part thereof being appealed." And Appellate Rule 4(a)(4)(B)(ii) adds that, to challenge an order ruling on a timely Rule 59(a) motion for a new trial, a party must file a timely notice of appeal or amended notice of appeal "in compliance with [Appellate Rule] 3(c)."[4] Thus, we lack appellate jurisdiction over a challenge to an order

---

[4]     In this case, we are concerned with how Appellate Rule 4(a)(4)(B)(ii) applies to a timely motion for a new trial under Rule 59(a). But that rule applies to other motions, too. *See* 16A Charles Alan Wright, et al., FEDERAL PRACTICE & PROCEDURE § 3950.4 (4th ed. 2008), Westlaw (database updated Sept. 2018) (noting that this rule applies to "any one of six kinds of motions"). Indeed, Appellate Rule 4(a)(4)(B)(ii) applies to "any motion listed in [Appellate] Rule 4(a)(4)(A)." And that latter rule lists six types of motions as falling within its ambit: (1) motions "for judgment under Rule 50(b)"; (2) motions "to amend or make additional factual findings under Rule 52(b)"; (3) certain motions "for attorney's fees under Rule 54"; (4) motions "to alter or amend the judgment under Rule 59"; (5) motions "for a new trial under Rule 59"; and (6) certain motions "for relief under Rule 60." Notably, Appellate Rule 4(a)(4)(B)(ii) draws no analytical distinction among these types of motions listed in Appellate Rule 4(a)(4)(A). We therefore consider cases involving those other motions instructive in assessing Appellate Rule 4(a)(4)(B)(ii)'s application to a motion for new trial, i.e., a Rule 59(a) motion. *See, e.g.*, *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 665–66 (6th Cir. 2008) (citing cases involving denial of motion to alter or amend judgment in analyzing appeal from denial of motion for new trial); *see also Triplett v. U.S. Dep't of Def.*, 441 F. App'x 618, 619 n.1 (10th Cir. 2011) (unpublished) (characterizing compliance with Appellate Rule 4(a)(4)(B)(ii) as necessary to appeal the denial of a "motion for post-judgment relief," without specifying which type of motion listed in Appellate Rule 4(a)(4)(A) was implicated); *West v. Ortiz*, No. 06-1192, 2007 WL 706924, at *4 (10th Cir. Mar. 9, 2007) (unpublished) (citing cases involving denial of request for attorney's fees in analyzing appeal from denial of Rule 60(b) motion).

denying a Rule 59(a) motion for a new trial unless the appellant designated that order "or parts thereof . . . in the notice of appeal." *Cunico v. Pueblo Sch. Dist. No. 60*, 917 F.2d 431, 444 (10th Cir. 1990); *cf. Foote v. Spiegel*, 118 F.3d 1416, 1422 (10th Cir. 1997) ("We have no jurisdiction to review the denial of qualified immunity . . . because it was not identified in the notice of appeal.").

### B

B55 and Mr. McArthur did not file a new or amended notice of appeal with respect to the district court's ruling on their Rule 59(a) motion. Thus, Appellate Rule 4(a)(4)(B)(ii) and our caselaw interpreting it appear to bar any challenge to that ruling. *See Breeden v. ABF Freight Sys., Inc.*, 115 F.3d 749, 752 (10th Cir. 1997) (holding that, "once the district court ruled on" a Rule 59(e) motion, a previously-filed notice of appeal "ripened" and became effective to appeal "the underlying case" and any orders specified in the notice of appeal, but failure to timely amend the earlier notice of appeal deprived this court of jurisdiction to review the Rule 59(e) ruling); *accord Ysais v. Richardson*, 603 F.3d 1175, 1179 (10th Cir. 2010); *cf. Smith v. United States*, 561 F.3d 1090, 1096 (10th Cir. 2009) (exercising jurisdiction over appeal of denial of Rule 59(e) motion because plaintiff filed separate notice of appeal relating specifically to that denial).

B55 and Mr. McArthur argue that they were not required to file a new or amended notice of appeal because "no issues presented by B55 on appeal were presented solely in its motion for new trial." Aplts.' Suppl. Br. at 3; *see also id.* ("[I]n this case, there is nothing new in the order denying the motion for new trial that changes or alters the

11

judgment or rulings made by the district court."). They cite *Hopkins v. I.R.S.*, 318 F. App'x 703 (10th Cir. 2009) (unpublished), for the proposition that Appellate Rule 4(a)(4)(B)(ii) does not apply because there were no issues unique to the denial of the Rule 59(a) motion. According to B55 and Mr. McArthur, "the district court's order denying [their Rule 59(a)] motion did not change or alter the status quo of the appealable issues," obviating the need for a new or amended notice of appeal. Aplts.' Suppl. Br. at 5.

But that argument is untenable in light of the plain text of Appellate Rule 4(a)(4)(B)(ii), which speaks of the *order* being challenged, not the *issues* raised in the specified post-judgment motions. *See* FED. R. APP. P. 4(a)(4)(B)(ii) ("A party intending to challenge *an order* disposing of [a Rule 59(a) motion] . . . , must file a notice of appeal, or an amended notice of appeal . . . ." (emphasis added)). And the rule certainly does not speak to whether the issues presented in those motions might also have been properly the subject of an appeal from the final judgment. Having elected in their appellate briefing to frame three of their claims of error as challenges to the district court's order denying their Rule 59(a) motion for a new trial, B55 and Mr. McArthur must abide by the consequences of doing so. *See also* Aplts.' Reply Br. at 2 n.1 (reiterating that several arguments in this appeal challenge the district court's ruling on the Rule 59(a) motion).

Our caselaw confirms the soundness of this conclusion. For example, in *Breeden*, the plaintiff's Rule 59(e) motion challenged the district court's failure to award pre-judgment interest, and we dismissed the plaintiff's appeal from the district court's order denying that motion for failure to file a new or amended notice of appeal. 115 F.3d at

12

752. We did not analyze whether this issue was unique to or solely appealable from the Rule 59(e) order; indeed, it seems that this issue could have been raised in a challenge to the final judgment. *See, e.g.*, *Cook v. Rockwell Intern. Corp.*, 618 F.3d 1127, 1134 (10th Cir. 2010) (observing that the district court's final judgment included an award of prejudgment interest); *Xiong v. Knight Transp., Inc.*, 77 F. Supp. 3d 1016, 1020, 1029 (D. Colo. 2014) (granting the plaintiff's request for entry of final judgment to include an award of prejudgment interest). In other words, the jurisdictional bar was triggered in *Breeden* even though the issue on appeal was not necessarily unique to the Rule 59(e) order and likely could have been appealed directly from the final judgment.

And B55 and Mr. McArthur's reliance on *Hopkins* is unavailing. To begin with, we are not bound by this non-precedential decision. What's more, that case actually undermines their position. The *Hopkins* panel reached a conclusion that B55 and Mr. McArthur seek to avoid in this case—namely, that failure to file a new or amended notice of appeal deprives an appellate court of jurisdiction to review a ruling on a motion governed by Appellate Rule 4(a)(4)(B)(ii). *See* 318 F. App'x at 705. As the panel explained, it could review only those rulings made in the district court's "underlying order," with respect to which a notice of appeal had been properly filed. *Id.* The portion of *Hopkins* upon which B55 and Mr. McArthur rely merely noted that the plaintiffs' failure to file an amended notice of appeal "likely ha[d] not prejudiced them" because it did not appear that they raised any issues on appeal that were presented solely in their post-judgment motion. *Id.* at 705 n.3. That is, the *Hopkins* panel did not decline to apply

13

Appellate Rule 4(a)(4)(B)(ii) in the first instance; indeed, there would have been no need to address the prejudicial impact of the rule (or lack thereof) had the rule not been applied. *Hopkins* therefore fails to assist B55 and Mr. McArthur.

The authorities point to a single conclusion: When an appellant challenges an order ruling on a motion governed by Appellate Rule 4(a)(4)(B)(ii), a new or amended notice of appeal is necessary even if the issue raised in the motion and sought to be challenged could also have been challenged in an appeal from the final judgment. Because we cannot excuse non-compliance with the jurisdictional requirements of Appellate Rule 4, *see Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 317 (1988), B55 and Mr. McArthur's failure to comply with these requirements precludes us from considering their challenges to the district court's order denying the Rule 59(a) motion. As such, we dismiss these challenges for lack of appellate jurisdiction.[5]

Relatedly, B55 and Mr. McArthur have moved to certify to the Oklahoma Supreme Court a question of state law relevant to the denial of their Rule 59(a) motion. *See* Aplts.' Mot. to Certify, No. 17-6034 (10th Cir., filed Apr. 21, 2017). Because we

---

[5] We note that B55 and Mr. McArthur advanced only this one theory for exercising appellate jurisdiction over these issues; we accordingly do not consider whether jurisdiction might have been available under some other theory. *See Raley v. Hyundai Motor Co.*, 642 F.3d 1271, 1275 (10th Cir. 2011) ("Where an appellant fails to lead, we have no duty to follow. It is the appellant's burden, not ours, to conjure up possible theories to invoke our legal authority to hear her appeal. Neither are we comfortable guessing for ourselves, without her help, what the answer might be to th[at] complex question . . . ."); *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002) ("The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction.").

14

dismiss for lack of jurisdiction the appellate issues to which the answer to the proposed question would be relevant, we deny as moot the motion to certify. *See Trout Unlimited v. U.S. Dep't of Agric.*, 441 F.3d 1214, 1220 (10th Cir. 2006) ("Because this court does not have jurisdiction over the issues raised in [the] motion to certify questions of state law, that motion is dismissed as moot." (emphasis omitted)); *accord Clark v. City of Shawnee*, 706 F. App'x 478, 482 (10th Cir. 2017) (unpublished) (denying motion to certify due to dismissal of the appeal for lack of jurisdiction).

We turn now to the issues properly before us on appeal.

### III

B55 and Mr. McArthur assert that the district court erred in granting Husky's request for a permanent injunction. The injunction prohibits them from contacting a number of Husky's business partners on the grounds that, absent the injunction, B55 and Mr. McArthur would continue to wrongfully meddle in Husky's business. B55 and Mr. McArthur, however, claim that the court erred because Husky could not prove that it would suffer irreparable harm without the injunction.

### A

We review the district court's grant of a permanent injunction for abuse of discretion. *See Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009) ("The district court's discretion in this context is necessarily broad and a strong showing of abuse must be made to reverse it." (quoting *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009))). A district court "necessarily abuse[s] its discretion if it base[s]

15

its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281, 1289 (10th Cir. 2005) (quoting *FDIC v. United Pac. Ins. Co.*, 152 F.3d 1266, 1272 (10th Cir. 1998)).  And a district court's factual findings are not clearly erroneous unless they are "without factual support in the record, or if [we], after reviewing all the evidence, [are] left with the definite and firm conviction that a mistake has been made." *Las Vegas Ice & Cold Storage Co. v. Far W. Bank*, 893 F.2d 1182, 1185 (10th Cir. 1990) (quoting *LeMaire v. United States*, 826 F.2d 949, 953 (10th Cir. 1987)).

To get a permanent injunction, a party "must prove: '(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.'" *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (quoting *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1180 (10th Cir. 2003)).

Proving irreparable harm—the only contested element here—is not "an easy burden to fulfill." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003).  We do not deem harm "irreparable" unless a petitioner can show "a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016) (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009)).  "Purely speculative harm will not suffice, but '[a] plaintiff who can show a significant risk of irreparable harm has

16

demonstrated that the harm is not speculative and will be held to have satisfied this burden.'" *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) (alteration in original) (quoting *RoDa Drilling*, 552 F.3d at 1210).

**B**

According to B55 and Mr. McArthur, because money damages are available, Husky did not prove that it would suffer irreparable harm. Specifically, they contend that the millions of dollars awarded to Husky on the tortious interference claim shows that Husky could be "compensated after the fact by money damages." *Fish*, 840 F.3d at 751 (quoting *RoDa Drilling*, 552 F.3d at 1210). Hence, B55 and Mr. McArthur reason that injunctive relief is unavailable in light of this adequate remedy at law. Aplts.' Opening Br. at 32–33 (citing, *inter alia*, *Schell v. OXY USA, Inc.*, 822 F. Supp. 2d 1125, 1142 (D. Kan. 2011) (declining to impose a permanent injunction because "plaintiffs have failed to show that money damages would not be sufficient to compensate any potential future injury" resulting from the defendants' termination of free gas to the plaintiffs)).

We disagree with the assertion that money damages are "available" in this case. First, the jury's award of money damages to compensate for a past injury does not materially inform whether Husky might be irreparably harmed in the future. As this court has explained, a jury's monetary award for past conduct does not preclude a court from entering a permanent injunction against similar wrongful conduct that is likely to occur in the future. *See Sw. Stainless,* 582 F.3d at 1190–92 (affirming award of money damages for past injury and of injunctive relief against future injury).

17

Second, and more importantly, B55 and Mr. McArthur's argument forgets that money damages are an inadequate remedy unless the extent of future harm to the party seeking the injunction can be calculated with a reasonable degree of certainty. *See Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) ("[W]hether money damages will constitute an adequate remedy requires consideration of the difficulty of proving damages with any reasonable degree of certainty." (citing RESTATEMENT (SECOND) OF CONTRACTS § 360(a) & cmt. b (1981))). And "when [a] court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain," our precedent says the "plaintiff suffers irreparable injury." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001). In other words, uncertainty as to the precise scope of anticipated harm vitiates the effectiveness of money damages and opens the door to equitable relief. *See Equifax Servs.*, 905 F.2d at 1361 (affirming district court's grant of preliminary injunction where district court found irreparable harm "based upon evidence suggesting that it is impossible to precisely calculate the amount of damage [the] plaintiff will suffer" (alterations in original omitted)).

Damages flowing from anticipated future injury to one's livelihood or business interests are especially difficult to calculate. We concluded as much in *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351 (10th Cir. 1986), when we reversed the district court's denial of a preliminary injunction after observing that "[a] threat to trade or business viability may constitute irreparable

18

harm." *Id.* at 356. We made this observation concrete in *Southwest Stainless*. There, the district court enjoined the defendant from encroaching on the plaintiffs' professional goodwill. And we affirmed "[b]ecause it is so difficult to prove the value of goodwill," and the potential for the defendant to deal "incalculable damage to that goodwill can constitute irreparable harm." 582 F.3d at 1192 (emphasis omitted). Other courts have similarly concluded that the destruction of a business could amount to irreparable harm. *See, e.g.*, *Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) (observing that "[r]ecoverable monetary loss" may be an irreparable harm when "the loss threatens the very existence of the movant's business"); *Ajilon Prof'l Staffing, LLC v. Griffin*, 2009 WL 1507559, at *4 (D. Ariz. May 29, 2009) (unpublished) ("It is well-settled that injury to or destruction of a business constitutes irreparable harm for which preliminary and permanent injunctive relief may be appropriate." (internal quotation marks and citations omitted)).

The district court's injunction is grounded on the logic of the above cases, and we are therefore inclined to uphold it. The district court found that "[t]he evidence at trial clearly established that absent an injunction [Mr.] McArthur and B55 w[ould] continue to tortiously interfere with Husky's contracts and business relationships in an effort to undermine and destroy Husky's business." Aplts.' App., Vol. XXVII, at 6161. It continued: "The damages resulting from the ongoing efforts of [Mr.] McArthur and B55 to interfere with Husky's the [sic] legitimate business relationships would be difficult, if not impossible, to quantify." *Id.* B55 and Mr. McArthur have not meaningfully

19

challenged these findings on appeal. Indeed, their argument that any prediction that they will continue to interfere with Husky's business is "specious" and "speculative," Aplts.' Opening Br. at 34, is so cursorily briefed that we are justified in deeming it waived. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) (deeming waived "arguments that are not raised, or are inadequately presented, in an appellant's opening brief"); *see also Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1133 n.4 (10th Cir. 2004) ("Scattered statements in the appellant's brief are not enough to preserve an issue for appeal."). In particular, B55 and Mr. McArthur make no effort to validate their conclusory labels (i.e., "specious" or "speculative") by pointing to evidence in the record. And, as we shall now see, such an effort would have been unavailing in any event.

Specifically, even if we were to consider this challenge, it would fail on the merits. The record is replete with evidence that B55 and Mr. McArthur relished the prospect of unraveling Husky's corporate existence. *See, e.g.*, Aplts.' App., Vol. XXIV, at 5806 (email from Mr. McArthur to Mr. Long, dated Feb. 26, 2015) ("Either we resolve our issues now or Husky . . . will be in a serious fight for [its] future starting next week."); *id.* at 5807 (email from Mr. McArthur to Mr. Long, dated May 25, 2016) ("Your decision to screw me out of our $4.5 million in capital . . . came at [a] heavy price to you . . . . I heard through the grapevine that you are going to throw everything you have at Torchlight . . . . So as you prepare your defense and throw everything at Torchlight, you should know that there are three or, perhaps four more very serious lawsuits that are in the drafting stages. You don't even know who or what you are fighting. . . . As I recall, your dad was in the

20

air force, so you will understand this analogy. The Enola Gay has taken off and is on its way to you. You simply leave no alternative. History repeats itself and sometimes it takes two or three trips."). Indeed, even after Husky sued them, B55 and Mr. McArthur continued to intentionally spark conflict between Husky and its business partners. *See id.*, Vol. XIII, at 3374 (providing Mr. McArthur's answer of "I did not" to counsel's question, "After you -- after B55 was sued by Husky Ventures in January of 2015, did you stop contacting Husky's partners?"). B55 and Mr. McArthur's unremittingly bellicose actions directed at Husky strongly signal that Husky faced a "significant," rather than "speculative," risk of future irreparable harm. *Crowe & Dunlevy*, 640 F.3d at 1157. In short, even if B55 and Mr. McArthur had not waived their argument on this point, the record supports the district court's finding that, absent an injunction, they would have continued their efforts to "undermine and destroy Husky's business." Aplts.' App., Vol. XXVII, at 6161. Thus, we are *not* left with a "definite and firm conviction that a mistake has been made." *Las Vegas Ice*, 893 F.2d at 1185.

In sum, at a minimum, B55 and Mr. McArthur posed a significant risk of continuing and future harm to Husky. They had threatened to destroy Husky's business before; in fact, they had succeeded in divesting Husky of key business relationships and its interests in numerous oil and gas leases. This threat continued even after Husky filed suit. Destruction of Husky's business at some future time would certainly impinge on, if not entirely extinguish, Husky's "business viability"—an irreparable harm under our precedent. *Tri-State Generation*, 805 F.2d at 356. Simply put, the threat of irreparable

21

harm here was apparent and far from speculative. Based on the foregoing, we see no reason not to uphold the district court's grant of the injunction.

**IV**

Both sides requested a declaratory judgment concerning the proper interpretation of two Participation Agreements between Husky and B55.[6] Following briefing and oral argument, the district court adopted Husky's interpretation.

On appeal, B55 and Mr. McArthur contend that the district court erroneously overlooked an ambiguity in the Participation Agreements that should have been construed against Husky—the drafter of the documents. Aplts.' Opening Br. at 38. Reviewing the contractual language de novo, *Milk 'N' More, Inc. v. Beavert*, 963 F.2d 1342, 1345 (10th Cir. 1992), we find no merit in that claim.

**A**

The Participation Agreements set out the terms of B55 and Husky's joint efforts to acquire and develop oil and gas leases within the Prairie Grove and Viking "Project Area[s] of Mutual Interest," sometimes called "Project AMI[s]." Aplts.' App., Vol. XXI, at 5494, 5519; *see also* Aplts.' Opening Br. at 38 (referencing the "Viking AMI" and the "Prairie Grove AMI"). Each Participation Agreement designated Husky as the

---

[6] The two contracts at issue are the Prairie Grove Project Participation Agreement and the Viking Project Participation Agreement. Because these contracts are identical in virtually all respects relevant to our inquiry, we refer to them collectively as the "Participation Agreement" or "Participation Agreements." Further, except where citation to both agreements is warranted, record citations to the contractual text are keyed to provisions of the Prairie Grove Project Participation Agreement.

"operator," making it responsible for drilling and management of wells contemplated in the Participation Agreements. Aplts.' App., Vol. XXI, at 5495. Husky was also generally tasked with directing and controlling the "future acquisition of additional leasing and drilling rights in the Project AMI." *Id.* at 5496. B55 was designated as a "participant," who—along with other participants—would receive the right to a working interest in existing wells in each project area and a future interest in additional leases developed by Husky within the area. *Id.* at 5494, 5496. B55 paid Husky a fixed sum of money to participate in the existing wells and agreed to contribute a pro rata amount of costs as to future leases, which Husky would communicate to B55 via monthly "Joint Interest Billing" ("JIB") statements. *Id.* at 5495–96.

Husky and B55 signed the Participation Agreements in the first half of 2014. According to the record, Husky presented B55—by way of monthly JIB statements—with lease offerings in June, July, August, and September 2014; B55 paid its share of the costs associated with those leases. But B55 then informed Husky that Husky was no longer authorized to charge "the joint account" for leases or lease brokerage related costs, arguing that the Participation Agreements required Husky to "offer each acquired lease to B55 on a lease by lease basis." *Id.*, Vol. XXVI, at 6021 (Letter from Mr. McArthur, dated Sept. 30, 2014). Soon thereafter, B55 purported to reject certain leases identified in prior JIBs and asked that the joint account be credited accordingly. Husky disagreed with B55's interpretation of the Participation Agreements, arguing that it did not need B55's

23

approval for any lease within an AMI. Husky warned B55 that its failure to pay any JIB

in full would be deemed a forfeiture of B55's right to participate in future leases.

**B**

Under Oklahoma law, which governs our analysis, the paramount objective of

contract interpretation is to ascertain and give effect to the intention of the parties. *See*

*Murphy v. Earp*, 382 P.2d 731, 733 (Okla. 1963). The parties' intent must be discerned

from the language of the contract "if the language is clear and explicit[] and does not

involve an absurdity." OKLA. STAT. tit. 15, § 154. We must also look to the entirety of

the agreement and construe "every provision . . . so as to be consistent with each other"

and adopt the construction that, "if possible, gives effect to every part of the contract."

*Sullivan v. Gray*, 78 P.2d 688, 690 (Okla. 1938); *see also* OKLA. STAT. tit. 15, § 157

("The whole of a contract is to be taken together, so as to give effect to every part, if

reasonably practicable, each clause helping to interpret the others.").

If a contract contains apparently contradictory terms, the terms should be

reconciled, if possible, by giving the offending clause some effect, "subordinate to the

general intent and purposes of the whole contract." OKLA. STAT. tit. 15, § 168. That said,

courts may not read words or terms into the contract that it does not contain. *See*

*Dismuke v. Cseh*, 830 P.2d 188, 190 (Okla. 1992). Courts also may not contort the plain

terms of the contract in order to avoid conflict. *See* OKLA. STAT. tit. 15, § 168

("Repugnancy in a contract must be reconciled, *if possible* . . . ." (emphasis added)) .

If none of these rules of interpretation resolves an ambiguity, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." OKLA. STAT. tit. 15, § 170. That is, any ambiguities left unresolved by the ordinary rules of contract interpretation must be interpreted against the drafter. As noted, however, this rule applies only where the ambiguity is "not removed by the preceding rules." *Id.*

## C

B55 and Mr. McArthur argue that there is an irresolvable contradiction between Paragraph 12, titled "Future Leasing," and Paragraph 18, titled "AMI," and that the resulting ambiguity must be construed against Husky, the drafter of the Participation Agreements. The parties share the same reading of Paragraph 12.[7] In fact, B55 and Mr.

---

[7]    Paragraph 12 provides, in relevant part, the following:

Future Leasing: PARTICIPANT shall have the right to participate with HUSKY in the future leasing, drilling and development of the Project Area pursuant to the provisions of this Agreement and the agreements through which HUSKY acquires additional leasehold rights within the Project Area. PARTICIPANT shall have the right to participate with an [sic] 10% working interest in the oil and gas leases as follows:

a)    Management of Leasing and Leasehold: HUSKY shall conduct, direct and control the future acquisition of additional leasing and drilling rights in the Project AMI . . . . PARTICIPANT agrees to bear its proportionate share of all costs that accrue after the date of this agreement and will carry HUSKY 15% on all future land costs as a Management Fee.

b)    Invoicing: HUSKY will send a Joint Interest Billing each month

(continued...)

25

McArthur admit that "Paragraphs 12(a) and (b) of the Participation Agreements appear to require that B55 Investments accept the entire package of leases that Husky offers on a monthly basis and pay JIBs in full." Aplts.' Opening Br. at 38. They further concede that Paragraph 12 explicitly "include[s] deadlines for when payment for the advanced leasing program is due, and state[s] that a participant that fails to fund in full within ten days of 'written notice' from Husky may—at Husky's election—give up the right to participate in future leases." *Id.* at 38–39; *see also* Aplts.' App., Vol. XXI, at 5496–97 (stating that a participant's failure to timely pay JIB may result in the participant "giv[ing] up all rights to acquire additional drilling rights in that billing and all future drilling rights that may be acquired in the [AMI]").

But B55 and Mr. McArthur assert that Paragraph 12 is not the only applicable provision. They argue that Paragraph 18 contradicts the terms in Paragraph 12 and that

---

[7](...continued)
> that will detail PARTICIPANT's share of the advanced leasing and drilling Acquisition Costs. PARTICIPANT agrees to send full payment within 15 days of receipt of the invoice. If PARTICIPANT's payment is not received within 20 days of the date of invoice, HUSKY may notify PARTICIPANT of such failure and PARTICIPANT failing to fund within ten (ten) [sic] days following receipt of written notice of such funding deficiency shall constitute, at HUSKY's election, an election by PARTICIPANT not to participate in the additional leasing *and PARTICIPANT shall give up all rights to acquire additional drilling rights in that billing and all future drilling rights that may be acquired in the Area of Mutual Interest.*

Aplts.' App., Vol. XXI, at 5496–97 (emphasis added).

26

this conflict is irreconcilable. The language of Paragraph 18 is reproduced here in relevant part:

> AMI: An Area of Mutual Interest ("AMI") shall be established within the boundaries of the Project Area as described in Exhibit A . . . . Subject only to the specific terms of this Agreement to the contrary, (1) should HUSKY . . . acquire an interest in any Leases in the AMI, HUSKY shall offer the interest to PARTICIPANT at a cost equal to PARTICIPANT's percentage of the leasehold bonus or purchase price to other participants in the Project Area proportionate to their Participation Interest in the Project Area . . . . Should an acquired interest lie both within and outside the AMI, for the purposes of the acquisition, the interest shall be deemed lying wholly within the AMI. Notwithstanding the foregoing, HUSKY shall have the right to identify areas of concentrated leasing and specify terms for advance leasing approval by PARTICIPANT. If and when approved by PARTICIPANT, PARTICIPANT shall authorize HUSKY to acquire leases in the designated area for the joint account, and HUSKY shall not be required to offer the individual leases to PARTICIPANT and PARTICIPANT shall be deemed to have approved same.

Aplts.' App., Vol. XXI, at 5498–99.

In B55 and Mr. McArthur's view, Paragraph 18 grants B55 the option of opting out of new leases without penalty. This reading of Paragraph 18 is grounded principally in its final sentences, which provide that a participant shall "authorize" Husky to acquire leases and ostensibly contemplate that Husky will either obtain "advance leasing approval" from participants or offer "the individual leases" to them, apparently with no adverse consequences flowing from the rejection of any lease so offered. According to B55 and Mr. McArthur, there is contractual ambiguity in the Participation Agreements because it is unclear whether Paragraph 12's stricter forfeiture rules or Paragraph 18's more flexible procedures would apply in the event of an unpaid JIB. Aplts.' Opening Br.

27

at 44–45. Thus, they argue, the ambiguity must be construed against Husky as the drafter of the Participation Agreements. *Id.*

Husky, on the other hand, argues that Paragraph 12 and those portions of Paragraph 18 are reconcilable. Aplee.'s Resp. Br. at 47–50. First, it contends that Paragraph 18 applies "[s]ubject . . . to the specific terms of this Agreement to the contrary." Aplts.' App., Vol. XXI, at 5498. Put differently, Husky claims that Paragraph 18 "applies only if no other specific provision of the contract addresses the issue at hand." Aplee.'s Resp. Br. at 47. Moreover, according to Husky, the provisions govern distinct situations. That is, the final sentences of Paragraph 18 apply when a proposed leasehold interest "lie[s] both within and outside the AMI." Aplts.' App., Vol. XXI, at 5499. When this is the case, "for the purposes of the acquisition, the interest shall be deemed lying wholly within the AMI." *Id.* Thus, the contract grants participants an opportunity to participate in a proposed leasehold even if it stretches beyond the original AMI delineated by the Participation Agreement. But because such a leasehold falls partially outside the area in which a participant agreed to "fully participate," Husky posits that the contract logically allows a participant an opportunity to decide whether to participate in the lease. Aplee.'s Resp. Br. at 49. It is to this scenario, and this scenario only, that the prior approval and authorization procedures discussed in the final sentences of Paragraph 18 apply, says Husky. Aside from that scenario, Husky reads Paragraph 18 as generally describing the same basic obligations as Paragraph 12—i.e., that Husky will offer leases

28

to B55, with Paragraph 12 simply specifying how the leases shall be offered and the consequence of B55's failure to accept. *Id.* at 48.

The district court agreed with Husky. In particular, it observed that the procedures described in the latter half of Paragraph 18 were textually confined to "leases in the designated area," rather than to leases within an AMI as a whole. Aplts.' App., Vol. XXVII, at 6153. The court also rejected B55 and Mr. McArthur's argument that "the designated area" was shorthand for the AMI, reasoning that, apart from the latter part of Paragraph 18, the drafters "rather consistently" used the term "AMI" to discuss a "geographic area." *Id.* It consequently concluded that there was no ambiguity in the contract and that the instant dispute, which concerns leases wholly within the AMI, was governed by Paragraph 12 rather than the latter part of Paragraph 18.

Our independent analysis leads us to uphold the district court's decision, largely for the reasons that Husky advances above. Moreover, even if the Participation Agreements are arguably ambiguous—e.g., due to varying interpretations of the effects of the "[s]ubject . . . to the specific terms of this Agreement to the contrary" or "[n]otwithstanding the foregoing" clauses in Paragraph 18—any ambiguities are resolvable via ordinary canons of contract interpretation without resort to construing the Participation Agreements against Husky as the drafter. OKLA. STAT. tit. 15, § 170. As Husky argues, its reading of the Participation Agreements not only reconciles any potential conflict between Paragraphs 12 and 18, *id.* § 168, but also gives effect to both provisions, *id.* § 157. That reading derives from and is harmonious with the plain text of

29

the contract and "does not involve an absurdity." *Id.* § 154. It also comports with the "general intent and purposes of the whole contract," *id.* § 168—that is, to facilitate mutually-beneficial oil acquisitions within the pre-defined, agreed-upon AMI. Logically, the Participation Agreements afford participants more leeway to opt into or out of leaseholds only partially within an AMI. In sum, Husky's reading satisfies Oklahoma's rules of contractual interpretation without construing any ambiguities against the drafter under a canon of last resort.

Accordingly, we uphold the grant of a declaratory judgment in Husky's favor.

## V

B55 and Mr. McArthur's final claim on appeal is that the district court erred in twice denying B55 leave to file amended counterclaims against Husky. We discern no error in the district court's ruling regarding either attempt.

## A

Resolution of this issue requires us to discuss in greater detail this case's procedural history. B55 initially filed counterclaims against Husky on February 4, 2015. During the early stages of the case, it twice received leave to amend. The first grant of leave to amend came in June 2015, and B55 timely filed an amended pleading. Several months later, B55 again sought leave to amend. The district court granted that request in part on February 17, 2016, advising that failure to submit proposed amended filings by February 24, 2016, would confine B55 to "proceed[ing] on the basis of the existing Amended Answer and Counterclaims." Aplts.' App., Vol. IX, at 2372 (Order, dated Feb.

30

17, 2016). At the same time, recognizing the lengthy pendency of the case, the district court granted Husky's request to set the case for a status and scheduling conference and announced that, "as of today's date, the time has passed for permitting amendments under the liberal standards of [Federal Rule of Civil Procedure] 15." *Id.*

B55, however, did not submit an amended filing before February 24 (the court's deadline), and, on March 1, 2016, the district court issued a scheduling order. In the space for setting a deadline for motions to amend the pleadings, the district court entered "N/A [i.e., Not Applicable]." *Id.* at 2374 (Scheduling Order, dated Mar. 1, 2016). The order set the deadline for discovery as October 15, 2016, and the trial for November 2016. Notably, the parties had first been authorized to begin discovery on March 2, 2015, nearly a year earlier.

In October 2016, about eight months after the scheduling order issued, B55 inserted a number of never-before-seen allegations of fraud into the final pretrial report, to which Husky objected. The district court construed this attempt to add new allegations to the final pretrial report as the equivalent of requesting leave to amend B55's counterclaims, which the court then denied. *See Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1285 (10th Cir. 2006) ("[A] plaintiff's 'attempt to add a new claim to the pretrial order [is] the equivalent of asking leave to amend his complaint . . . .'" (second alteration in original) (quoting *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006))); *accord Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ("[T]he inclusion of a claim in the pretrial order is deemed to amend any previous pleadings

31

which did not include that claim."). Because the window to submit amendments under Rule 15 had closed back in February, the district court determined that B55 had to show good cause under Rule 16(b)(4) before it could modify the scheduling order. Finding that B55 offered no arguments to justify its tardiness, the district court sustained Husky's objections and excluded the belated fraud allegations.

On October 27, 2016, twelve days after the discovery cut-off set by the scheduling order, B55 moved for time in which to amend the counterclaims—this time through a formal motion under Rule 16—and asked to postpone trial for four months. In addition to pressing the previously-excluded fraud allegations, B55 sought to add ten new parties and to depose several individuals allegedly associated with Husky's fraud scheme. The court held a hearing on the matter and, citing B55's lack of diligence in conducting discovery and pursuing the proposed amendments, denied the motion in a ruling from the bench.

**B**

B55 and Mr. McArthur argue that B55 should have been granted leave to amend its counterclaims. Because the decision to grant or deny a motion to amend is committed to the sound discretion of the trial court, we review only "for an abuse of discretion." *Davey v. Lockheed Martin Corp.*, 301 F.3d 1204, 1208 (10th Cir. 2002); *accord Doelle v. Mountain States Tel. & Tel.*, 872 F.2d 942, 947 (10th Cir. 1989).

At the outset, we note that the district court applied the correct legal standard to the challenged attempts at amendment. "After a scheduling order deadline, a party seeking leave to amend must demonstrate (1) good cause for seeking modification under Fed. R.

32

Civ. P. 16(b)(4) and (2) satisfaction of the Rule 15(a) standard." *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014); *see also SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1518 (10th Cir. 1990) ("Scheduling orders are not to be modified by the trial court except when authorized by local rule upon showing of good cause." (citing FED. R. CIV. P. 16)).

Although all parties seemingly agree that both Rule 15 and Rule 16 governed the formal motion to amend, B55 and Mr. McArthur appear to contend that the district court should have applied only the more lenient Rule 15 standard to B55's attempt to amend by way of the final pretrial report. *See* Aplts.' Opening Br. at 48–49 (reciting only Rule 15 principles); *see also* FED. R. CIV. P. 15(a)(2) (instructing courts to "freely give leave [to amend] when justice so requires"). The procedural history of this case, however, constrains us to disagree. The district court determined that B55's additions to the pretrial report effectively constituted an attempt to amend the scheduling order. B55 and Mr. McArthur do not challenge this determination on appeal. And so "Rule 16—which specifically governs amendments to scheduling orders"—applies with full force. *Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1195 (10th Cir. 2015); *accord Bylin v. Billings*, 568 F.3d 1224, 1231 (10th Cir. 2009) ("Rule 16 governs amendments to scheduling orders.").

"Rule 16(b)(4) is arguably more stringent than Rule 15, permitting scheduling order amendments 'only for good cause and with the judge's consent.'" *Zisumbo*, 801 F.3d at 1195 (citations omitted). "In practice, [the Rule 16(b)(4)] standard requires the

33

movant to show the 'scheduling deadlines cannot be met despite [the movant's] diligent efforts.'" *Gorsuch*, 771 F.3d at 1240 (alteration in original) (quoting *Pumpco, Inc. v. Schenker Int'l, Inc.*, 204 F.R.D. 667, 668 (D. Colo. 2001)). Because Rule 16 requires diligence, B55 and Mr. McArthur cannot establish good cause if B55 "knew of the underlying conduct but simply failed to raise [its] claims." *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1248 (10th Cir. 2015) (alteration in original) (quoting *Gorsuch*, 771 F.3d at 1240).

The district court did not abuse its discretion in ruling that both attempts to amend the counterclaims failed to satisfy this Rule 16(b)(4) standard. The amendment-via-pretrial-report is easily disposed of because, as the district court observed, B55 made absolutely "no arguments to show good cause for late amendment of the pleadings." Aplts.' App., Vol. XI, at 2840. Because good cause obligates the moving party to "provide an adequate explanation for any delay," the district court did not abuse its discretion by refusing to permit amendment at that juncture. *Minter*, 451 F.3d at 1205 n.4, *accord Strope v. Collins*, 315 F. App'x 57, 61 (10th Cir. 2009) (unpublished) (affirming Rule 16(b)(4) denial where the movant neglected to articulate any rationale for the untimeliness of the motion to amend).

Though meriting a little more discussion, the formal motion to amend fares no better. B55 and Mr. McArthur assert that B55 established good cause under the rule articulated in *Pumpco*, which permits modifications based on newly-obtained information that a litigant unearths through discovery. *See* 204 F.R.D. at 668–69. According to B55

34

and Mr. McArthur, though B55 made every effort to "pursue[] discovery in a diligent fashion," Aplts.' Opening Br. at 52, its "discovery of the fraud was made more difficult due to Husky's obstreperous behavior during document discovery and depositions," Aplts.' Reply Br. at 19. Thus, it was not until after "depositions of key witnesses" in mid-October 2016 that they say B55 could "confirm[] what it had only previously suspected—primarily that Husky had been engaged in fraud." *Id.* at 18.

The district court was not convinced by this argument, and neither are we. The record—which indicates that B55, through Mr. McArthur, knew of the allegedly "new" information months before the motion to amend—fatally undercuts their ability to demonstrate good cause. *See Birch*, 812 F.3d at 1248 (stating that movants lack good cause if they "knew of the underlying conduct but simply failed to raise [their] claims" (alteration in original) (quoting *Gorsuch*, 771 F.3d at 1240)). As the district court observed, Mr. McArthur's "threats of lawsuits against various people, including those [B55] propose[d] now to join as counterclaim defendants . . . make[] [it] abundantly clear that [B55, through Mr. McArthur, was] aware of litigation possibilities against these people months ago." Aplts.' App., Vol. XI, at 2903.

For example, Mr. McArthur opined in an email dated April 15, 2016, that Mr. Gregg McDonald, who was listed as a potential new defendant in the formal motion to amend, "[m]ight as well [be] name[d] . . . now." *Id.* at 2873 (Email, dated Apr. 15, 2016); *see also id.* at 2844. Yet, as noted, the formal motion was not filed until October 2016—more than six months later. Similar emails from May 2016 also evinced B55's

knowledge of potential claims against Mr. Long, Chase Graham, and April Glidewell, each of whom was also identified as a proposed new party in the motion. It was far from an abuse of discretion for the district court to deny the motion to amend under these circumstances. *See SIL-FLO, Inc.*, 917 F.2d at 1518–19 (affirming denial under Rule 16(b)(4), where defendants' filings demonstrated that they had known of facts underlying their proposed counterclaims months before they sought to amend).

And even if B55 had not known the full extent of these litigation possibilities earlier, it squandered any opportunity to raise those claims by not diligently investigating the facts necessary to bring them. Our precedent requires a movant to show that "the scheduling deadlines [could not] be met despite [the movant's] diligent efforts." *Gorsuch*, 771 F.3d at 1240 (second alteration in original) (quoting *Pumpco*, 204 F.R.D. at 668); *accord Cook v. Howard*, 484 F. App'x 805, 818–19 (4th Cir. 2012) (unpublished) (upholding district court's finding of no good cause and noting that "in considering whether 'good cause' excuses compliance with a scheduling order deadline, the district court *must* examine whether the movant had been diligent, though unsuccessful, in attempting to acquire the information that would have formed the basis of a timely motion to amend"); *see also Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011) ("In making a Rule 16(b) good-cause determination, the primary consideration for district courts is the diligence of the party seeking amendment."); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) (same).

As the district court noted, the parties were advised in March 2015 that they could begin discovery immediately. And, in the scheduling order issued almost one year later in March 2016, the district court clearly informed the parties that the discovery cut-off was October 15, 2016. Despite the ample time granted by these deadlines, "[n]o motion to compel was filed . . . as to any discovery issue until October 15th," the very day that discovery was set to close. Aplts.' App., Vol. XI, at 2902. And the motion to amend—submitted October 27, 2016, on the eve of trial—was even more tardy.

Under these circumstances, the district court found, in effect, that B55's showing of good cause was inadequate because it had failed to exercise reasonable diligence in acquiring the supposedly newly discovered information that formed the basis of its motion to amend. The court's own words succinctly underscore this failing: "The long and the short of it is that even if this motion is predicated on information that was not in hand . . . until a month ago, these are matters that could have and . . . should have been discovered far before that and long before that." *Id.* Thus, the court concluded that B55 made "no semblance of a showing of good cause . . . including a showing of diligent efforts -- or that despite diligent efforts [it] could not comply with the scheduling order." *Id.* at 2905.

We agree with the district court. It did not abuse its discretion in finding a lack of good cause because B55 did not act with reasonable diligence in unearthing—through the customary tools of discovery—the ostensibly "newly discovered evidence," Aplts.' Opening Br. at 52, that allegedly justified the motion to amend. *See S. Grouts & Mortars,*

37

*Inc. v. 3M Co.*, 575 F.3d 1235, 1242 (11th Cir. 2009) (rejecting movant's argument that the opposing party's "'stonewalling' its discovery requests" excused its untimely motion to amend, given that movant did not file its first interrogatory or depose any witness relating to the subject matter of the motion "until after the deadline had passed for amending pleadings and discovery and after the parties had filed motions for summary judgment"); *see also Escandon v. Los Angeles Cty.*, 584 F. App'x 517, 519–20 (9th Cir. 2014) (unpublished) ("Given Escandon's multiple month delay in propounding any discovery, his failure to move to compel responses to his discovery before the discovery cut-off, and his filing of this motion on the last permissible day, the district court correctly determined that Escandon had not been diligent and therefore did not have 'good cause' to support his motion."); *cf. Alioto*, 651 F.3d at 720 ("[The movant] argues chiefly that he had no reason to know that his complaint was deficient until the defendants filed their motions to dismiss the complaint. That explanation does not pass muster. The requirements for surviving a motion to dismiss are matters of hornbook civil procedure law, and a party should always ask itself whether the complaint it wants to file sets out a viable claim."). As the Eleventh Circuit pithily stated, "lack of diligence can include a plaintiff's failure to seek the information it needs to determine whether an amendment is in order." *S. Grouts & Mortars*, 575 F.3d at 1241 n.3. The district court here did not abuse its discretion in finding that B55 lacked this sort of diligence.

To be sure, B55 and Mr. McArthur allege that B55 was somehow hindered by Husky's "uncooperative behavior" during discovery. Aplts.' Opening Br. at 52; *see also*

Aplts.' Reply Br. at 19 ("[D]iscovery of the fraud was made more difficult due to Husky's obstreperous behavior during document discovery and depositions."). But this argument—advanced in essentially two stray sentences—is conclusory and so "skeletal" that we deem it waived. *United States v. Pursley*, 577 F.3d 1204, 1231 n.17 (10th Cir. 2009); *see Exum*, 389 F.3d at 1133 n.4 ("Scattered statements in the appellant's brief are not enough to preserve an issue for appeal."). In this regard, nothing in B55 and Mr. McArthur's briefing sheds light on the particulars of Husky's alleged discovery-related misconduct or on how that misconduct might have contributed to B55's failure to raise the proposed amendments earlier.

In sum, we hold that the district court acted within its discretion to deny B55's motion to amend, as it "had ample time to comply with the deadline established in the scheduling order." *Gorsuch*, 771 F.3d at 1242. Put another way, we must "affirm the denial of leave to amend because the district court did not act outside its broad range of discretion." *SCO Grp., Inc. v. Int'l Bus. Machs. Corp.*, 879 F.3d 1062, 1086 (10th Cir. 2018).

## VI

B55 and Mr. McArthur's challenges to the district court's order denying their motion for a new trial are **DISMISSED** for lack of appellate jurisdiction, and their motion to certify a related question to the Supreme Court of Oklahoma is accordingly **DENIED** as moot. We **AFFIRM** the district court's rulings with respect to the issues properly presented to us.